Marvin Wexler (MW-6521)
Emily Rosdeitcher (ER-3546)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

Gregory J. Vogt
LAW OFFICES OF GREGORY J. VOGT, PLLC
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314
(703) 838-0115

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| BETH ISRAEL MEDICAL CENTER, CONTINUUM HEALTH PARTNERS, INC., and ST. LUKE'S-ROOSEVELT HOSPITAL CENTER, | 11-CV-4509 (RJS)<br>ECF Case |
| Plaintiffs, | |
| -against- | |
| VERIZON BUSINESS NETWORK SERVICES INC., VERIZON COMMUNICATIONS INC., VERIZON NEW YORK INC., and VERIZON SERVICES CORP., | **COMPLAINT** |
| Defendants. | **Jury Trial Demanded** |

------------------------------------------------------------X

      Plaintiffs Beth Israel Medical Center, Continuum Health Partners, Inc., and St. Luke's-Roosevelt Hospital Center, by and through their attorneys, Kornstein Veisz Wexler & Pollard, LLP and Law Offices of Gregory J. Vogt, PLLC, allege, with personal knowledge as to their own

actions and otherwise upon information and belief, as follows:

1.  Plaintiffs, which are affiliated not-for-profit New York corporations, bring this action to remedy grossly improper billing practices and other wrongful acts by the named Defendants (collectively, "Verizon") and to recover millions of dollars that Verizon wrongfully induced Plaintiffs to pay. As set forth below, Verizon has engaged in an intensive, systematic and prolonged pattern of overbilling Plaintiffs for services that Verizon agreed to provide to Plaintiffs -- as well as billing Plaintiffs for services that Plaintiffs never requested or wanted or ever used. In fact, Verizon has admitted and acknowledged much of those overcharges and overpayments. But Verizon nonetheless has refused to repay to Plaintiffs large amounts of money that Plaintiffs mistakenly paid to Verizon based on Verizon's wrongful bills. Verizon thus has compelled Plaintiffs to bring this lawsuit to recover that money.

The Parties

2.  Plaintiff Continuum Health Partners, Inc. is a not-for-profit New York corporation located in New York City that is the parent company of Plaintiffs Beth Israel Medical Center and St. Luke's-Roosevelt Hospital Center, each of which also is a New York not-for-profit institution. Continuum Health Partners, Inc. is headquartered at 555 West 57th Street in Manhattan, Beth Israel Medical Center is headquartered at First Avenue and East 16th Street in Manhattan, and St. Luke's-Roosevelt Hospital Center is headquartered at 1111 Amsterdam Avenue in Manhattan. Plaintiffs are referred to herein collectively as "the Hospitals," even though Continuum Health Partners, Inc. is itself not a hospital.

3.  Defendant Verizon Business Network Services Inc. is a Delaware corporation with its principal place of business located at One Verizon Way, VC53 N124, Basking Ridge, New

Jersey 07920.

4. Defendant Verizon New York Inc. is a New York corporation with its principal place of business located at 140 West Street, 29th Floor, New York, New York 10007.

5. Defendant Verizon Communications Inc. is a Delaware corporation with its principal place of business located at 140 West Street, 29th Floor, New York, New York 10007 that was formed out of a merger between Bell Atlantic Corporation and GTE Corporation in 2000.

6. Verizon Services Corp. is a Delaware corporation with its principal place of business located at 1320 North Courthouse Road, Arlington, Virginia 22201.

7. The aforesaid Defendants (collectively "Verizon") are responsible for the acts, omissions and obligations of their predecessors, affiliates, and subsidiaries, including, but not limited to, the acts, omissions and obligations of Bell Atlantic Corporation d/b/a Bell Atlantic-New York, Bell Atlantic-New Jersey, New York Telephone d/b/a NYNEX, and MCI WorldCom Communications, Inc., MCI Network Services, Inc. and MCI Financial Management Corp. Verizon itself uses the aforesaid names interchangeably. Some of Verizon's contracts provide that the signatory Verizon company, such as Verizon Services Corp., is entering into the contract "on behalf of" other Verizon entities, such as Verizon New York Inc., and those Verizon contracts collectively define all the contracting entities as "Verizon." Other Verizon contracts provide that the contract is made by "Verizon," without defining that term, and refer to predecessor entities as "d/b/a Verizon Business Services." Verizon also refers to itself simply as "Verizon" in many of its business records and correspondence, and some of the Verizon billings at issue here were payable to "The Verizon Telephone Companies."

Jurisdiction and Venue

8. Pursuant to 28 U.S.C. § 1331, this Court has original subject matter jurisdiction by reason of federal question jurisdiction.

9. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the State law claims asserted herein.

10. Venue is proper in this Court under 28 U.S.C. §§ 1391 in that a substantial part of the events or omissions giving rise to the claims herein occurred in this Judicial District.

## The Pertinent Facts

A. Verizon Overcharged The Hospitals for Long-Distance Services

11. The Hospitals contracted with Verizon for Interstate, International and Intrastate Voice Services, and the contract provided that Verizon would charge the Hospitals at a rate of 3.3 cents per minute for interstate calls and slightly more for intrastate calls.

12. Over the course of approximately 16 months, Verizon in fact billed the Hospitals at a far higher rate, in most cases ten times the contracted rate.

13. The Hospitals paid those bills, unaware of the overcharges.

14. Verizon's overcharges for this service resulted in overpayments by the Hospitals to Verizon of approximately $1 million, exclusive of interest.

15. Verizon has admitted that it overbilled the Hospitals for the aforesaid services.

16. Verizon has admitted that the Hospitals overpaid Verizon approximately $1 million for the aforesaid services.

17. In discussions with the Hospitals after this overcharge/overpayment was discovered, Verizon agreed to repay the Hospitals part of that overpayment.

18. Verizon agreed to repay to the Hospitals the part of the overpayment that was charged during the last 6 months of the lengthy period of admitted overcharges/overpayments, amounting to approximately $500,000. Verizon's position is that the Hospitals can only recover the overpayments for those last 6 months.

19. In fact, there is no such 6-month limitation for mistaken overpayments.

20. Verizon has refused to repay approximately $468,000 of this overcharge/overpayment. Furthermore, when Verizon recently repaid the overpayment for the 6 month period that Verizon saw fit to repay, Verizon repaid only the overpayment principal and not interest on that principal. The contract in question provides for, and Verizon regularly charges its customers, 18% interest annually. Because Verizon had the use of the Hospitals' overpayment for more than 2 years, Verizon continues to owe the Hospitals approximately $200,000 in interest on the portion of this overcharge that Verizon saw fit to repay. Verizon also owes the Hospitals 18% interest annually on all the overpayments that Verizon has not repaid. All told, including interest at 18% annually, Verizon continues to owe the Hospitals approximately $900,000 as a result of these overcharges/overpayments.

B. Verizon Continued to Bill For Its Temporary Transparent
   LAN Services Fix After that Temporary Fix Became Moot

21. Verizon contracted with the Hospitals to install Intellilight Optical Transport Service ("IOT Service"), which is based on fiber optic ring technology using Dense Wavelength Division Multiplexing ("DWDM") technology. DWDM is a technology that is designed to reduce the need to deploy expensive equipment in the fiber network when bandwidth capacity is increased. However, the IOT Service with DWDM technology was not immediately available.

22. Verizon proposed to the Hospitals, and the Hospitals agreed, that, as a temporary solution until the IOT Service with DWDM technology was available and activated, Verizon would install four Gigabit Ethernet Transparent Local Area Network ("Transparent LAN") circuits. Verizon subsequently installed, and began to bill the Hospitals for, those Transparent LAN circuits.

23. As part of the agreement concerning this temporary fix, Verizon was supposed to terminate the Transparent LAN circuits when the IOT Service with DWDM technology commenced operation. But Verizon did not do that. Instead, Verizon continued thereafter for several years to bill the Hospitals for the Transparent LAN circuits, at the same time that Verizon was billing the Hospitals for the DWDM Service that superseded, and made unnecessary, the Transparent LAN circuits that had been installed only as a temporary fix.

24. As a result of Verizon's failure to stop billing the Hospitals for the Transparent LAN circuits, the Hospitals mistakenly paid Verizon twice for the same thing (the Transparent LAN circuits and the DWDM Service) over a period of several years.

25. The aforesaid double-billing and double payment amounted to approximately $870,000, exclusive of interest. When interest at 18% annually is included, Verizon owes the Hospitals approximately $1.2 million on these overcharges/overpayments.

26. In discussions between the parties, Verizon has admitted that Verizon double-billed, and that the Hospitals double-paid, for these services, over an extended period of time. But Verizon has refused to return the money that the Hospitals overpaid. That refusal was based on Verizon's argument that the Hospitals were obligated to submit a disconnect request for the Transparent LAN circuits -- even though the temporary fix had been Verizon's proposal, Verizon

had agreed to remove the circuits when the IOT Service with DWDM technology became operative, and the Hospitals did not know, and had no way of knowing, that Verizon required the Hospitals to submit a disconnect request.

C.  Verizon Continued to Bill for its Replaced IDSR Service, Contrary To Its Agreement To Stop That Billing

27.  Prior to entering into the IOT Service contract, the Hospitals took Intellilight Dedicated Sonet Ring ("IDSR") service from Verizon. Verizon's contract with the Hospitals for the aforesaid IOT Service provided:

> Billing. Verizon will commence billing all rate elements of the [IOT] Service simultaneously at the start of the [IOT] Service Period. When such billing commences, Verizon will stop billing, without termination liability, for the existing Verizon IDSR service.

28.  Contrary to that agreement, Verizon continued to bill the Hospitals for the replaced IDSR Service for several years after Verizon began billing the IOT Service to the Hospitals.

29.  As a result of that wrongful continued billing, the Hospitals mistakenly paid to Verizon approximately $1.2 million, exclusive of interest.

30.  In subsequent discussions between the parties, Verizon has admitted that Verizon should have stopped billing the IDSR Service when it started billing the IOT Service, that Verizon's billing of the IDSR Service after it began billing the IOT Service was contrary to the parties' contract, and that as a result the Hospitals paid approximately $1.2 million that the Hospitals should not have paid. But Verizon agreed to repay the Hospitals less than half of that $1.2 million. Verizon refused to repay the bulk of this overpayment based on an argument that that part of this claim for repayment was barred by a supposed two-year statute of limitations.

31. Verizon's statute of limitations excuse for failing to repay this money has no merit, and Verizon owes the Hospitals approximately $743,000 without interest, and approximately $1.7 million counting interest, based on these overcharges and overpayments.

D. Verizon Billed a Surcharge for Services That The Hospitals Never Requested, Wanted Or Used

32. Verizon billed the Hospitals a surcharge on so-called T-1 network connections that the Hospitals used only for transmitting data. The surcharge is supposed to apply only when the T-1 lines are configured to be capable of using voice services.

33. The T-1 lines at issue were not configured to be capable of using voice services, and the Hospitals never requested, wanted or used the T-1 service for voice service.

34. The Hospitals paid Verizon approximately $166,000 in such improper surcharges, exclusive of interest. Including interest, the overcharge and overpayment was approximately $340,000.

35. In subsequent discussions between the parties, Verizon did not dispute that the Hospitals did not request, want or use the T-1 Service for voice services. But Verizon refused to repay the Hospitals the $166,000 in surcharges that Verizon had obtained for this unrequested, unwanted and unused service. Verizon took the position that, to avoid the surcharge, the Hospitals had to request an exemption in advance of Verizon's wrongful billing for the unwanted T-1 service. The Hospitals were never informed, and did not know, that they had to request an exemption in order not to be billed a surcharge. Verizon had a duty to inform its customer of the need to seek such an exemption, and Verizon failed in that duty. In addition, Verizon was responsible for installing the data-only service as requested by the customer, and violated its own

tariff by failing to take the proper steps necessary to charge for the service ordered by the customer in accordance with its tariff. Verizon's failure to request an exemption certificate from the Hospitals was a dereliction of Verizon's duty to provide the service as ordered by the customer. Furthermore, nothing in the tariff requires that the exemption certificate be signed prior to the customer being billed for the service, in order for the exemption to be applied to the T-1 services to which the exemption is applicable.

E. Verizon Double-Billed The Hospitals for
   Services That The Hospitals Had Already Pre-Paid

36. As Verizon well knew, the Hospitals had a contract with GE Capital pursuant to which GE Capital pre-paid Verizon for seven years of certain Verizon services to the Hospitals ("the Pre-Payment Program").

37. Verizon co-marketed the Pre-Payment Program with GE Capital in order to induce the Hospitals and other potential customers, to enter into a seven-year service agreement with Verizon at a supposed discount. Verizon falsely represented that the Pre-Payment Program would reduce the cost of Verizon's services to the customer.

38. Pursuant to the Pre-Payment Program, the Hospitals paid GE Capital, and GE Capital pre-paid Verizon for those certain Verizon services to the Hospitals.

39. Despite having been pre-paid by GE Capital, Verizon nonetheless billed the Hospitals for a lengthy period of time for the same services for which GE had pre-paid Verizon.

40. As a result of this double-billing by Verizon, the Hospitals mistakenly over-paid Verizon more than $3 million to Verizon, exclusive of interest. When interest is included, the amount owed by Verizon exceeds $7 million.

41. The Hospitals did not discover this part of Verizon's overbilling until this Spring.

## FIRST CAUSE OF ACTION
(Breach of Contract)

42. Plaintiffs repeat and reallege paragraphs 1 through 41 as if fully set forth herein.

43. Verizon breached its contractual obligations to the Hospitals, and that wrongdoing caused damage to the Hospitals, as alleged above.

## SECOND CAUSE OF ACTION
(Unjust Enrichment)

44. Plaintiffs repeat and reallege paragraphs 1 through 41 as if fully set forth herein.

45. Verizon's overbilling unjustly enriched Verizon at the Hospitals' expense, and the Hospitals are entitled to restitution.

## THIRD CAUSE OF ACTION
(Money Paid By Mistake/Money Had and Received)

46. Plaintiffs repeat and reallege paragraphs 1 through 41 as if fully set forth herein.

47. Verizon's overbilling resulted in money paid by mistake, and the Hospitals are entitled to the repayment of that money had and received by Verizon.

## FOURTH CAUSE OF ACTION
(Fraud)

48. Plaintiffs repeat and reallege paragraphs 1 through 41 as if fully set forth herein.

49. Verizon's systematic double-billing (in fact, billing ten times the correct amount in the case of the long-distance calls), over an extended time frame of many years, constitutes fraud, not inadvertent error. Verizon has engaged in a long-term and large-scale pattern and practice of

fraudulent overbilling.

50. An additional element of the fraud concerns Verizon's attempt to prevent discovery of its wrongdoing and to shield itself from liability for its wrongdoing.

51. Verizon attempts to prevent discovery of its overbillings by designing its bills in such a massive, complex, technical and obfuscatory way that its bills will not be understood by its customers.

52. Verizon attempts to shield itself from liability for its overbilling through what amounts to the unilateral amendment by Verizon of its contract terms. For example, the contract for the long-distance services referenced in ¶¶ 11-20 above provided that the provision of services "will be governed by [Verizon's] international, interstate and state tariffs ('Tariff(s)') and [Verizon's] Service Publication and Price Guild ('Guide'), each as supplemented by this Agreement." That contract further provided:

> This Agreement incorporates by reference the terms of each such Tariff and Guide . . . . [Verizon] may modify the Guide from time to time, and any modification will be binding upon Customer. Customer may sign-up for email alerts of Guide changes at www.mci.com/guide/subscription. Except for new services, service features, service options, or service promotions, which will become effective immediately upon their posting in the Guide on the Website, any modification made to the Guide will become effective on the date indicated in the Guide, provided that no such modification shall become effective and binding on Customer until it has been posted in the Guide for at least 16 calendar days . . . . If [Verizon] makes any changes to the Guide . . . which affect Customer in a material and adverse manner, Customer may discontinue the affected Service without liability by providing [Verizon] with written notice of discontinuance within 60 days of the date such change is posted on the Website.

After entering into such contracts, Verizon then unilaterally publishes, in its Guide, supposed new

contract terms, prejudicial to its customers and designed to try to provide full or partial defenses to Verizon's wrongful billing practices. As part of this scheme, Verizon's Guide and Website are designed to be impenetrable to its customers, encompassing a huge mass of material and employing hyper-technical language, acronyms and code words that are not understandable to persons and entities like the Hospitals, who have no background in telecommunications. Verizon thus relies on the fact that its customers either will not discover the supposed new contract terms in time to avoid the new terms by timely disengaging with Verizon, or will not be willing to discontinue Verizon's services, especially on such short notice, and after having committed to Verizon services for an extended period. These additional deceptive practices are designed to support Verizon's systematic overbilling, and to make a profit center out of its overbilling, by putting in place, ex post facto, a system designed to dissuade or disenable its customers from obtaining redress for Verizon's overbilling.

## FIFTH CAUSE OF ACTION
(Under Sections 201 and 207 of the Federal Communications Act)

53. Plaintiffs repeat and reallege paragraphs 1 through 52 as if fully set forth herein.

54. Verizon's actions at issue here constitute levying unreasonable charges, and engaging in unreasonable practices, under Section 201 of the Federal Communications Act, 47 U.S.C. §§ 201 and 207.

## SIXTH CAUSE OF ACTION
(Violation of Section 349 of the
New York General Business Law)

55. Plaintiffs repeat and reallege paragraphs 1 through 52 as if fully set forth herein.

56. Verizon has engaged in unfair methods of competition and materially unfair,

deceptive, and misleading acts or practices in the conduct of trade and/or commerce, in violation of the New York Unfair Business Practices Act (New York Gen. Bus. Law § 349), to the Hospitals' harm and to the harm of members of the public.

57. Verizon victimized other consumers of its services by means of some or all of the same kind of large-scale, systematic, overlapping, concurrent and extended overbilling as alleged above. Verizon's unfair methods of competition and materially unfair, deceptive, and misleading acts or practices were aimed at and did have a material impact on consumers at large in that they are directed to numerous other Verizon customers, and they materially affect or potentially affect customers of Verizon's that are similarly situated.

58. As a consequence of Verizon's willful and knowing violation of New York Gen. Bus. Law § 349, the Hospitals have been directly and proximately damaged in the millions of dollars, the Hospitals are entitled to the statutory remedies, including reimbursement of attorneys' fees and expenses; and with respect to continuing violations, the Hospitals have no adequate remedy at law and therefore are entitled to injunctive relief.

WHEREFORE Plaintiffs demand judgment against Defendants as follows:

a. On the first cause of action, awarding damages in such amount as necessary to compensate Plaintiffs for all damages suffered by Plaintiffs as a result of Defendants' wrongdoing, plus pre-Judgment interest at the contractually set rate;

b. On the second cause of action, requiring Defendants to make restitution to Plaintiffs of all their unjust enrichment;

c. On the third cause of action, ordering Defendants to repay to Plaintiffs all money mistakenly paid and improperly had and received;

d. On the fourth cause of action, awarding compensatory damages in such amount as

13

necessary to compensate Plaintiffs for all damages suffered by Plaintiffs as a result of Defendants' wrongdoing, plus punitive damages of $25,000,000.00;

  e. On the fifth cause of action, recovering all unreasonable charges billed by Defendants and paid by Plaintiffs;

  f. On the sixth cause of action, awarding damages in such amount as necessary to compensate Plaintiffs for all damages suffered by Plaintiffs as a result of Defendants' wrongdoing, reimbursing Plaintiffs for their attorney's fees and other expenses of this litigation, and enjoining Defendants from engaging in any further such wrongdoing; and

  g. Granting such other and further relief as may be just, together with interest, costs and disbursements, including attorneys' fees.

Dated: New York, New York
    June 30, 2011

          KORNSTEIN VEISZ WEXLER & POLLARD, LLP

          By: _____
             Marvin Wexler (MW-6521)
             Emily Rosdeitcher (ER-3546)
          757 Third Avenue
          New York, New York 10017
          Tel.: (212) 418-8600
          Fax: (212) 826-3640

            and

          Gregory J. Vogt
          Law Offices of Gregory J. Vogt, PLLC
          2121 Eisenhower Avenue, Suite 200
          Alexandria, Virginia 22314
          Tel.: (703) 838-0115
          Fax: (703) 684-3620

          Attorneys for Plaintiffs